# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA ex rel. Frank Solis,

Plaintiff-Appellant/Cross-Appellee,

v.

MILLENNIUM PHARMACEUTICALS, INC., et al.,

Defendants-Appellees/Cross-Appellants.

---

On Appeal from the United States District Court
for the Eastern District of California

---

# BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY

---

BENJAMIN C. MIZER
  *Principal Deputy Assistant Attorney General*

PHILLIP A. TALBERT
  *Acting United States Attorney*

MICHAEL S. RAAB
DANIEL TENNY
JOSEPH F. BUSA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-0261*

# TABLE OF CONTENTS

**Page**

INTEREST OF THE UNITED STATES ........................................................................ 1

STATEMENT OF THE CASE ................................................................................... 2

    A.     The False Claims Act ................................................................. 2

    B.     Other Statutory Provisions ....................................................... 3

           1.     The Federal Food, Drug, And Cosmetic Act .................. 3

           2.     Drug Coverage And The Public Health Insurance
                Programs ..................................................................... 4

           3.     The Anti-Kickback Statute .............................................. 6

    C.     Proceedings In This Case .......................................................... 7

ARGUMENT ....................................................................................................... 9

I.     False Claims ............................................................................................. 9

    A.     Claims Seeking Reimbursement For Medical Care Are False
          Where That Care Arises From An Illegal Kickback. ................... 9

    B.     Claims Seeking Reimbursement For Non-Reimbursable Medical
          Care Are False ........................................................................ 11

II.     Drug Companies May Proximately Cause Medical Providers To Submit
    False Claims For Payment To The Government .................................... 12

III.     Medicare's Bundled Payment Systems Do Not Invite Fraud On The
    Government. ...................................................................................... 19

CONCLUSION ................................................................................................. 27

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008) .............................. 15

*Appalachian Reg'l Healthcare, Inc. v. Shalala*,
    131 F.3d 1050 (D.C. Cir. 1997) ...................................................................23, 24, 25

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*,
    447 U.S. 557 (1980) ......................................................................................... 18

*Cook Cty. v. United States ex rel. Chandler*,
    538 U.S. 119 (2003) ........................................................................................... 2

*Ebeid ex rel. United States v. Lungwitz*,
    616 F.3d 993 (9th Cir. 2010) .................................................................6, 10, 11

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) ......................................................................................... 17

*Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ......................................................................................... 17

*In re Neurontin Mktg. & Sales Practices Litig.*,
    712 F.3d 21 (1st Cir. 2013) .............................................................................. 14

*Junius Constr. Co. v. Cohen*,
    178 N.E.2d 672 (1931) ..................................................................................... 20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ..................................................................................... 15

*Loving v. United States*,
    517 U.S. 748 (1996) ......................................................................................... 10

*Moore ex rel. Moore v. Reese*,
    637 F.3d 1220 (11th Cir. 2011) ......................................................................... 5

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) ......................................................................................... 18

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ....................................................................................16, 17

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011) ................................................. 12, 15

*United States v. Mackby*,
261 F.3d 821 (9th Cir. 2001) ................................... 16

*United States ex rel. Hendow v. University of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) ................................. 10

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,
647 F.3d 377 (1st Cir. 2011) .............. 6, 10, 12, 21, 22, 26

*United States ex rel. Marcus v. Hess*,
317 U.S. 537 (1943) ................................................. 10

*United States ex rel. Rost v. Pfizer, Inc.*,
507 F.3d 720 (1st Cir. 2007) ................................... 15

*United States ex rel. Schmidt v. Zimmer, Inc.*,
386 F.3d 235 (3d Cir. 2004) .................................. 12, 14

*United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*,
472 F.3d 702 (10th Cir. 2006) ................................ 12

*United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*,
750 F.3d 111 (1st Cir. 2014) ................................... 15

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
136 S. Ct. 1989 (2016) .......................... 9, 11, 15, 19, 20, 22

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) ................................................. 18

**Statutes:**

Anit-Kickback Statute:

42 U.S.C. § 1320a-7a(a)(7) ..................................... 6, 21

42 U.S.C. § 1320a-7b ............................................. 9

42 U.S.C. § 1320a-7b(b) ......................................... 6, 21

42 U.S.C. § 1320a-7b(b)(2) ..................................... 6

42 U.S.C. § 1320a-7b(g) ........................................................7, 10, 21

False Claims Act:

31 U.S.C. § 3729 *et seq.* ........................................................... 1

31 U.S.C. § 3729(a)(1)(2006) .................................................... 3

31 U.S.C. § 3729(a)(1)(A) ................................................. 3, 11, 16, 17

31 U.S.C. § 3729(a)(1)(B) .......................................................3, 12, 17

31 U.S.C. § 3729(a)(2)(2006) .................................................... 3

31 U.S.C. § 3729(b)(1)(B) ....................................................... 14

31 U.S.C. § 3729(b)(4)........................................................... 19

31 U.S.C. § 3730(a) ............................................................... 3

31 U.S.C. § 3730(b) ............................................................... 3

31 U.S.C. § 3730(b)(1) ............................................................ 3

31 U.S.C. § 3730(c)(3) ............................................................ 3

31 U.S.C. § 3730(d) ............................................................... 3

31 U.S.C. § 3730(e)(4)(A) ........................................................ 8

Fraud Enforcement and Recovery Act of 2009,
Pub. L. No. 111-21, 123 Stat. 1617 ........................................... 3

10 U.S.C. § 1079(h)(1)........................................................... 5

21 U.S.C. § 321(p)............................................................... 4

21 U.S.C. § 355(a) ............................................................... 4

21 U.S.C. § 355(d)............................................................... 4

21 U.S.C. § 396................................................................... 4

28 U.S.C. § 517.................................................................. 2

42 U.S.C. § 1395k(a)(1) ............................................................... 5

42 U.S.C. § 1395*l*(t) ................................................................... 22

42 U.S.C. § 1395*l*(t)(5) .............................................................. 23

42 U.S.C. § 1395*l*(t)(6) .............................................................. 23

42 U.S.C. § 1395*l*(t)(14) ............................................................ 5

42 U.S.C. § 1395m(g)(1) ............................................................. 23

42 U.S.C. § 1395w-102(e)(1) ....................................................... 5

42 U.S.C. § 1395w-102(e)(3)(A) ................................................... 5

42 U.S.C. § 1395w-102(e)(4) ....................................................... 5

42 U.S.C. § 1395x(s)(2) ............................................................... 5

42 U.S.C. § 1395x(t)(1) ............................................................... 5

42 U.S.C. § 1395x(t)(2)(A) ........................................................... 5

42 U.S.C. § 1395y(a) ............................................................... 5, 11

42 U.S.C. § 1395y(a)(1)(A) ................................................... 5, 22, 24

42 U.S.C. § 1395ww(d) .............................................................. 22

42 U.S.C. § 1395ww(d)(5)(A) ...................................................... 23

42 U.S.C. § 1395ww(d)(5)(K) ...................................................... 23

42 U.S.C. § 1396a(a)(17) ............................................................. 5

42 U.S.C. § 1396a(a)(19) ............................................................. 5

42 U.S.C. § 1396a(a)(30)(A) ......................................................... 5

42 U.S.C. § 1396r-8(d)(1)(B)(i) ..................................................... 5

42 U.S.C. § 1396r-8(d)(1)(k)(3) .................................................... 5

42 U.S.C. § 1396r-8(d)(1)(k)(6) .................................................... 5

42 U.S.C. § 1396r-8(d)(1)(g)(1)(B)(i) ...................................................................... 5

**Regulations:**

32 C.F.R. § 199.4(g)(15)(i)(A) ................................................................................. 5

42 C.F.R. § 412.1 ..................................................................................................... 23

42 C.F.R. § 412.2(b)(1) ........................................................................................... 25

42 C.F.R. § 412.60 ................................................................................................... 23

42 C.F.R. § 419.2 ..................................................................................................... 23

42 C.F.R. § 419.31 ................................................................................................... 23

42 C.F.R. § 440.230(d) ............................................................................................. 5

**Rules:**

Fed. R. App. P. 29(a) ................................................................................................ 2

Fed. R. Civ. P. 9(b) .................................................................................................. 8

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 8

**Legislative Materials:**

H. Rep. No. 95-393 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 3039 ................................ 6

S. Rep. No. 99-345 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266 ................................ 2

**Other Authorities:**

FDA, *Guidance for Industry:  Distributing Scientific and Medical Publications on Unapproved New Uses—Recommended Practices* (rev'd draft Feb. 2014), http://www.fda.gov/downloads/drugs/guidancecomplianceregulatory information/guidances/ucm387652.pdf .......................................................... 4

Medicare Benefits Policy Manual, Ch. 15, § 50.4.2, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/ downloads/bp102c15.pdf ............................................................................... 5

26 R. Lord, *Williston on Contracts* (4th ed. 2003) ............................................. 20

William L. Prosser, *Misrepresentation and Third Persons*,
  19 Vand. L. Rev. 231 (1966).................................................................. 14

Restatement (Second) of Contracts (1981) ...................................................... 20

Restatement (Second) of Torts (1965) ................................................13, 15, 20

## INTEREST OF THE UNITED STATES

This case presents the question whether drug companies may be held liable under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, for knowingly causing medical providers to prescribe or administer their drugs and causing those drugs to be paid for by the submission of false claims for reimbursement to the government. The United States submits this amicus brief to protect its ability to recover against drug companies who knowingly defraud the public health insurance programs.

In the complaint at issue here, a former salesman for three drug companies alleges that the companies paid kickbacks to doctors so that the doctors would use the companies' drugs to treat patients. He further alleges that the companies engaged in false or misleading marketing activities regarding the safety and efficacy of their drugs. And he alleges that, though the companies' drugs are approved by the Food and Drug Administration (FDA) for certain uses, the companies marketed their drugs for other, unapproved uses that were not covered by the public health insurance programs. These kickbacks and marketing activities are alleged to have proximately caused medical providers to administer the companies' drugs to treat beneficiaries of public health insurance programs and for those drugs to be paid for by the submission of false claims for reimbursement. The district court denied the drug companies' motions to dismiss the complaint for failure to state a claim but dismissed the case for lack of subject-matter jurisdiction. The relator appeals, and the companies cross-

appeal.  The United States submits this brief as amicus curiae in the cross-appeal, in support of neither party.  *See* 28 U.S.C. § 517; Fed. R. App. P. 29(a).

The False Claims Act is the federal government's primary tool to combat fraud and recover losses due to fraud in federal programs.  The United States has a substantial interest in ensuring that courts properly interpret the FCA and the statutes and regulations governing the public health insurance programs.  The FCA permits recovery against drug companies who knowingly cause the submission of materially false claims for payment to the government by paying illegal kickbacks to medical providers, by engaging in materially false or misleading marketing activities, or by marketing drugs to providers for non-reimbursable uses.  If this Court reaches the issues raised in the cross-appeal, this Court should interpret the FCA to permit recovery against drug companies in such circumstances.  The United States takes no position on the adequacy of the allegations in the underlying complaint.

## STATEMENT OF THE CASE

### A. The False Claims Act

The False Claims Act is "the Government's primary litigative tool" for combatting fraud.  S. Rep. No. 99-345, at 2 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5266.  The Act applies broadly to address a wide variety of fraudulent schemes, and it was drafted "expansively . . . to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quotation marks omitted).

Under the current version of the Act, an FCA violation can occur when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). A violation may also occur when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).[1]

Suits to collect statutory damages and penalties under the Act may be brought either by the Attorney General or by a private person (known as a *qui tam* relator) in the name of the United States. 31 U.S.C. § 3730(a), (b)(1). If a *qui tam* action is filed, the government may intervene and take over the case. *Id.* § 3730(b). If the government declines to intervene, as here, the relator conducts the litigation, *id.* § 3730(c)(3)—though the government may still file an amicus brief in the litigation to protect its broader interests. Monetary awards from a *qui tam* suit are divided between the government and the relator. *Id.* § 3730(d).

## B.     Other Statutory Provisions

### 1.     The Federal Food, Drug, And Cosmetic Act

Under the Federal Food, Drug, and Cosmetic Act, a new drug must be approved by the FDA as safe and effective for each of its intended uses before the

---

[1] This version of the statute took effect on May 20, 2009. *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621. Previous versions phrased these provisions differently. *See* 31 U.S.C. §§ 3729(a)(1), (2) (2006). Although some conduct in this case predates 2009, *see* ER 62-63, the differences are not material to the issues in this case. Defendants' Br. 4 n.1.

drug may be introduced into interstate commerce for such intended uses.  21 U.S.C.

§§ 321(p), 355(a), (d).  As a general matter, that statute does not prohibit doctors from

prescribing or administering FDA-approved drugs for other, unapproved uses.  *Id.*

§ 396; FDA, *Guidance for Industry: Distributing Scientific and Medical Publications on*

*Unapproved New Uses—Recommended Practices* 6 (rev'd draft Feb. 2014),

http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/

guidances/ucm387652.pdf ("[A] health care professional can generally choose to use

or prescribe an approved or cleared medical product for an unapproved use, if the

off-label use is appropriate based on his or her judgment.").

> **2.     Drug Coverage And The Public Health Insurance Programs**

The three public health insurance programs at issue in this case—Medicare,

Medicaid, and Tricare—operate on a reimbursement model.  Healthcare providers—

hospitals, clinics, doctors, and pharmacies—provide medical items and services to

program beneficiaries.  The providers then submit requests for reimbursement to the

entity in charge of payment for the particular public health insurance program (such

as the state under Medicaid, or a federal contractor under Medicare).

Not all items or services that a provider may decide to give to a patient are

covered by the public health insurance programs.  Coverage is governed by the

specific programs' statutes, regulations, and administrative determinations.  Those

requirements vary by health insurance program, by program benefit, and, in some

instances, by type of drug or use. As relevant here, unapproved uses of FDA-approved drugs are not covered by the public health insurance programs in certain situations, such as where the unapproved use is not medically reasonable or necessary, or where the unapproved use is not supported by citations in certain compendia.[2]

If a drug is not covered by the public health insurance programs for a particular use, a claim for payment for that use is not reimbursable by the government. *See, e.g.*, 42 U.S.C. § 1395y(a) (providing that "no payment may be made" for items or services

---

[2] Medicare Part A covers drugs administered by a hospital on an inpatient basis only where the care is medically "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). The same limitation applies to drugs administered on an outpatient basis under Medicare Part B. *Id.* Part D prescription drug plans may elect to deny coverage on the same basis, *id.* § 1395w-102(e)(3)(A), as may state Medicaid programs, *see Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232-33 (11th Cir. 2011); *see also* 42 U.S.C. § 1396a(a)(17), (19), (30)(A); 42 C.F.R. § 440.230(d). Medicare also requires that a drug be used for a "medically accepted indication" in order to be covered for outpatient administration in an anticancer chemotherapy regimen under Part B, 42 U.S.C. §§ 1395k(a)(1), 1395x(s)(2), (t)(2)(A), or to be covered under a prescription drug plan under Part D, *id.* § 1395w-102(e)(1), (4). Generally, a "medically accepted indication" is one that is either approved by the FDA or "supported by one or more citations" in specified "compendia" of clinical research and medical standards of practice. *See* 42 U.S.C. § 1396r-8(d)(1)(B)(i), (g)(1)(B)(i), (k)(3), (k)(6). Medicaid also permits states to limit coverage to drugs used for a "medically accepted indication." *See id.* Relatedly, drugs administered under Medicare Part B outside of a chemotherapy regimen are covered only if they are included in a specified set of publications or approved by a provider's committee, *id.* §§ 1395k(a)(1), 1395x(s)(2), (t)(1), and Part B covers the unapproved use of an FDA-approved drug only where the use is "medically accepted" on the basis of compendia, literature, and standards of practice, *see* Medicare Benefit Policy Manual, Ch. 15, § 50.4.2, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf (last accessed Nov. 17, 2016). Tricare restricts reimbursement by cross-reference to the Medicare statute generally. *See* 10 U.S.C. § 1079(h)(1); *see also* 32 C.F.R. § 199.4(g)(15)(i)(A).

excluded from coverage under Medicare Parts A and B). This Court has held that a non-reimbursable claim for payment is a false claim under the FCA. *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 996-98 (9th Cir. 2010).

### 3. The Anti-Kickback Statute

The Anti-Kickback Statute (AKS) prohibits any person from paying any remuneration to another person to induce the use of a medical item or service for which reimbursement may be sought from the public health insurance programs. 42 U.S.C. § 1320a-7b(b)(2). The AKS ensures that care provided to beneficiaries of the public health insurance programs results from sound medical judgment, not an illegal kickback. *See* H. Rep. No. 95-393, at 44 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 3039, 3047 (making violations of AKS a felony, and explaining that fraud in federal health care programs "cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program").

Violations of the AKS may result in criminal penalties, civil monetary penalties of $50,000 per violation, treble damages, and exclusion from participation in public health insurance programs. 42 U.S.C. §§ 1320a-7a(a)(7), 1320a-7b(b). Courts have recognized that claims for reimbursement for medical care arising from an illegal kickback are false claims within the meaning of the FCA. *See, e.g., United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 392-93 (1st Cir. 2011). And in 2010, Congress amended the AKS to underscore that conclusion: "[A] claim that includes

. . . services resulting from a violation of [the AKS] constitutes a false . . . claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g).

### C.  Proceedings In This Case

1.  The relator, Frank Solis, worked as a drug sales representative for three drug companies, Millennium Pharmaceuticals, Inc., Schering-Plough Corp., and Merck & Co.  In that role, he promoted Integrilin, a blood-clotting inhibitor approved to treat certain heart attack patients, and Avelox, an antibiotic approved to treat adults experiencing certain types of infection.  Excerpt of Record (ER) 53-54, 62-63.

Solis brought this *qui tam* action on behalf of the United States under the False Claims Act against those drug companies.  *See* ER 50, 65.[3]  Solis alleged that the defendants, through their activities promoting Integrilin and Avelox, knowingly caused false claims for reimbursement to be submitted the government for use of those drugs.  Solis alleged that this fraud occurred through two mechanisms.  First, Solis alleged that the defendants gave doctors cash and other items "as kickbacks in exchange for the physicians' agreement to prescribe [two of the companies' drugs]."  ER 57.  These payments, Solis alleged, violated the Anti-Kickback Statute.  ER 60-62.

Second, Solis alleged that the defendants marketed their drugs for uses that were not reimbursable by the public health insurance programs.  The drug uses were

---

[3] Solis also brought claims on behalf of several states under state analogs to the False Claims Act.  ER 112-92.  The district court declined to take supplemental jurisdiction over these claims after dismissing the federal FCA claims.  ER 3-4, 21.

allegedly not approved by the FDA, not supported by a citation in a drug compendium, and not medically reasonable and necessary. ER 59, 67-70. The defendants' marketing also allegedly included "false" and "misleading statements" about drug efficacy and safety. ER 59. The defendants allegedly knew that the uses for which they were marketing their drugs were "never appropriate" and "extremely dangerous." ER 54; *see also* ER 56.

Solis alleged that the drug companies' kickbacks and marketing activities were designed to sell more drugs, knowing that this conduct would naturally, foreseeably, and directly cause providers to use the companies' drugs to treat beneficiaries of public health insurance programs and cause the drugs to be paid for by the submission of false claims to the government. *See* ER 57, 69-71, 104-06. Moreover, Solis alleged that the drug companies targeted providers based on the providers' "Medicare volume information," ER 94-95, taught those providers to "overcom[e]" government reimbursement requirements, ER 86, and instructed those providers to seek reimbursement in ways "Medicaid or Medicare were known to pay for without question." ER 102.

2. The defendants moved to dismiss for failure to state a claim and for failure to plead fraud with particularity, Fed. R. Civ. P. 9(b), 12(b)(6), and the district court denied those motions. ER 8; Supplemental Excerpt of Record (SER) 1-12. The district court granted the defendants' separate motions to dismiss for lack of subject-matter jurisdiction under the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4)(A).

*See* ER 4, 8.  Solis appeals that dismissal.  The United States does not take a position

on the issues raised in the primary appeal.  The defendants cross-appeal the district

court's denial of their motions to dismiss for failure to state a claim and failure to

plead fraud with particularity.

## ARGUMENT

I.    **False Claims**

    A.    **Claims Seeking Reimbursement For Medical Care Are False
          Where That Care Arises From An Illegal Kickback.**

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, prohibits paying any

remuneration to induce the use of a medical item or service for which reimbursement

may be sought from the public health insurance programs.  The defendants do not

dispute that claims arising from an illegal kickback are false within the meaning of the

FCA.  Indeed, compliance with the AKS goes to the heart of what the government

purchases when it procures health care for beneficiaries of the public health insurance

programs:  the assurance that care is being provided based on professional medical

judgment.  A kickback eliminates any sound basis for such assurance.  Accordingly,

when providers submit a claim to the government for reimbursement, they implicitly

represent that the underlying care complied with the AKS.   Where a claim for

payment does not disclose non-compliance with the AKS, the claim is false.  *See*

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000 (2016)

(stating "the rule that half-truths—representations that state the truth only so far as it

goes, while omitting critical qualifying information—can be actionable misrepresentations"); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

In addition, medical providers sign an agreement with Medicare in which they acknowledge that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with" the AKS. ER 568; *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 392-93 (1st Cir. 2011). If such a provider fails to comply with the AKS, the express certification of compliance with the AKS is false, and so is the resulting claim. *Hutcheson*, 647 F.3d at 392-93; *see also Ebeid*, 616 F.3d at 998; *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1170-73 (9th Cir. 2006) (characterizing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943)).

Finally, Congress amended the AKS in 2010 to clarify that "a claim that includes . . . services resulting from a violation of [the AKS] constitutes a false . . . claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g). This provision governs any claims submitted in this case after the effective date, and it is also persuasive evidence that claims submitted before that date are false on the theories discussed above. *See Loving v. United States*, 517 U.S. 748, 770 (1996) ("[S]ubsequent legislation clarifying the intent of an earlier statute is entitled to great weight in statutory construction.").

### B. Claims Seeking Reimbursement For Non-Reimbursable Medical Care Are False.

If use of a medical item or service is not covered under the terms of the public health insurance programs, a claim for payment for that item or service is not reimbursable by the government. *See, e.g.*, 42 U.S.C. § 1395y(a). And a claim for reimbursement that is not payable due to an undisclosed violation of a material requirement is a false claim. *Ebeid*, 616 F.3d at 996-98, 1001; *see also Escobar*, 136 S. Ct. at 2000 (declining to "resolve whether all claims for payment implicitly represent . . . entitle[ment] to payment," and thereby leaving intact existing circuit precedent to that effect, such as *Ebeid*).

Statutes, regulations, and administrative decisions determine which drug uses the public health insurance programs cover, and which they do not. In general, the insurance programs deny coverage for the unapproved use of an FDA-approved drug in certain situations, such as where the unapproved use is not medically reasonable or necessary, or where the unapproved use is not supported by a citation in a compendium. *See supra* note 2. Accordingly, a claim for reimbursement for the non-reimbursable use of a drug is a false claim. And a drug company that knowingly causes the submission of such a claim may be liable under the FCA. *See* 31 U.S.C. § 3729(a)(1)(A).

In particular, a drug company may be liable under the FCA where it causes the submission of a non-reimbursable claim by making false or misleading statements

material to reimbursability. 31 U.S.C. § 3729(a)(1)(B). For example, a drug company may be liable when it knowingly makes false or misleading statements that a particular drug use is covered under the public health insurance programs, or that a particular drug use has certain characteristics that are relevant to coverage (such as representations that the drug use has been approved by the FDA, or that an unapproved drug use is supported by a compendium citation).[4]

## II. Drug Companies May Proximately Cause Medical Providers To Submit False Claims For Payment To The Government.

**A.** Based on traditional principles of causation in tort law, defendants may be held liable under the FCA for causing others to submit false claims where the defendants are both the factual and legal (*i.e.*, proximate) cause of such submission. *See Hutcheson*, 647 F.3d at 391-92; *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714 (10th Cir. 2006); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244-45 (3d Cir. 2004). Causes are proximate where they have a natural and foreseeable tendency to produce the harm in question, directly contribute to that harm without undue attenuation, and constitute a substantial factor (in light of all of the other factual causes) such that the defendant should be responsible for the harm. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)

---

[4] The relator's complaint might be read to state an additional theory of FCA liability: that a drug company's violation of the misbranding provisions of the Federal Food, Drug, and Cosmetic Act, on its own and as a matter of law, makes subsequent claims for reimbursement for that misbranded drug false under the FCA. *See* ER 57-58. The government does not support that theory of liability.

(foreseeability and directness); Restatement (Second) of Torts § 431 (1965) (substantial factor).

**B.** A drug company's marketing may proximately cause the submission of false claims to the government. A direct, natural, and foreseeable consequence of a drug company's marketing is that medical providers will prescribe or administer a company's drugs as marketed. And it is similarly natural and foreseeable that, after using the company's drugs as marketed, providers will then seek reimbursement from the government, as is the normal course where the patient is a beneficiary under the public health insurance programs. The proximate connection between the drug company's actions and the submission of the false claim is clear where the drug company's false or misleading marketing activities or kickbacks are designed to induce the provider to prescribe or administer the drug and submit false claims to pay for it. A proximate connection may also exist where the drug company knowingly markets a drug for non-reimbursable uses where payment would ultimately be made from the federal government.

Here, the relator has alleged that the defendants targeted providers based on the providers' "Medicare volume information," ER 94-95, taught those providers to "overcom[e]" government requirements, ER 86, and instructed those providers to seek reimbursement in ways "Medicaid or Medicare were known to pay for without question." ER 102. Accordingly, this Court need not explore the outer boundaries of

when non-claims-submitters may proximately cause the submission of false claims under the FCA.

Where the expenditure of federal funds is the intended and primary result of drug companies' conduct, and not simply a fortuitous side effect, there is no question that those companies may be held liable for proximately causing the submission of false claims. *Cf.* William L. Prosser, *Misrepresentation and Third Persons*, 19 Vand. L. Rev. 231, 240 (1966) ("[T]here is invariably liability for intentional deceit."). This may be proved through direct evidence. And it may also be inferred from context, such as the commercial context in which a drug company desires to sell more drugs and relies on providers to submit claims to the government in order to finance the transactions. *See Schmidt*, 386 F.3d at 244 ("[A]n important, if not essential, characteristic" of the FCA-defendant's business was that medical providers remain eligible for participation in public health insurance programs, as without such eligibility "the purpose of [the defendant's] marketing scheme—selling as many of it[s] implants as possible . . . — would be thwarted."); *Cf. In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 39 (1st Cir. 2013) (in RICO claim, drug company's fraudulent marketing activity proximately caused economic loss to private insurer who paid for prescriptions caused by the defendant); *see also* 31 U.S.C. § 3729(b)(1)(B) (the FCA's scienter element "require[s] no proof of specific intent to defraud").

**C.** The defendants argue that kickbacks and marketing activity could not cause medical providers to submit false claims for payment to the government

14

because providers make their own prescribing and billing decisions. Defendants' Br. 55-61. But "it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action . . . from being the proximate cause of the harm." *Staub*, 562 U.S. at 419. Where the intervening actions by a third party are within the risk that makes the defendant's actions tortious, the intervening actions are not a superseding cause and thus do not sever the causal chain. *See* Restatement (Second) of Torts §§ 440, 442, 449; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390-91 (2014) (applying traditional proximate cause principles in Lanham Act case and concluding that defendant's false advertising proximately injured commercial competitor's sales, despite intervening step of consumer behavior). The Supreme Court endorsed the application of traditional common-law principles, like these, to the FCA in *Escobar*. *See* 136 S. Ct. at 1999-2000 & nn.2, 3. Here, marketing drugs for non-reimbursable uses, making false or misleading statements material to payment, or paying illegal kickbacks raises precisely the risk that providers will administer or prescribe the drugs and that government reimbursement will be sought in the normal course. *See United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 732 n.9 (1st Cir. 2007) ("That there were allegedly intervening persons who actually submitted the claims does not itself necessarily break the causal connection . . . ."), *overruled in part on other grounds by Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), *as recognized in United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 750 F.3d 111, 113 (1st Cir. 2014).

15

The defendants also contend that this Court held in *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001), that an FCA defendant may be held liable for causing the submission of false claims only where the defendant plays a personal role in the claim-submission process. Defendants' Br. 57, 59. *Mackby* held that a manager who directed the use of a false billing code on a claim form was responsible for causing the submission of a false claim. 261 F.3d at 827. It did not hold that, regardless of traditional principles of proximate causation, only defendants with a personal role in claims submission may be held liable under the FCA. Those traditional principles apply to the FCA.

**D.** The defendants further argue that even if the relators could establish that the defendants proximately caused false claims to be submitted to the government, holding the defendants liable for their marketing activities would violate their rights to free expression under the First Amendment. Defendants' Br. 61-69. But no such constitutional impediment exists. The First Amendment permits FCA liability against drug companies who knowingly and proximately cause the submission of false claims in order to increase drug sales.

"[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). "That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs, why an ordinance against outdoor fires

might forbid burning a flag, and why antitrust laws can prohibit agreements in restraint of trade." *Id.* (citations and quotation marks omitted).

The FCA restricts conduct: presenting false claims for payment to the government, or causing others to do so. *See* 31 U.S.C. § 3729(a)(1)(A) (holding liable "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"). It does not regulate speech. Nothing on the face of this provision of the FCA mentions speech or speakers, nor is there any evidence that Congress enacted that provision in order to burden speech.[5] *Compare id.*, *with Sorrell*, 564 U.S. at 567 (concluding that a Vermont law "imposes a burden based on the content of speech and the identity of the speaker" both "on its face and in its practical operation").

Certainly one of the many ways in which an FCA defendant may cause others to submit false claims to the government is by speaking to the claim-submitter. But the First Amendment does not preclude the government from making a course of conduct illegal merely because the conduct may be carried out by means of speech. For example, in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 497-98 (1949), the Supreme Court held that union picketing was lawfully enjoined where, in addition to

---

[5] Another provision of the FCA holds liable "any person who . . . knowingly makes . . . a false . . . statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The defendants do not argue that this provision of the FCA violates the Constitution. *See Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud.").

promoting truthful facts about a labor dispute, the picketing was also part of a scheme designed to pressure a company to join an illegal restraint on trade. In this context, a defendant may not immunize itself from FCA liability simply by using speech to accomplish the plainly impermissible goal of causing the submission of false claims to the government. If holding such a defendant liable burdens the defendant's speech at all, it does so only incidentally to the course of conduct that the FCA regulates.

Moreover, at least two features of commercial speech doctrine also permit FCA liability against a drug company that knowingly causes the submission of false claims to the government by means of commercial marketing. First, there is no First Amendment protection for false or misleading commercial speech, such as when a drug company knowingly makes false or misleading representations in its commercial marketing activities to medical providers. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 563-64 (1980); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976).

Second, there is no First Amendment protection for "commercial speech related to illegal activity." *Central Hudson*, 447 U.S. at 563-64; *see also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388-89 (1973) (no constitutional obstacle to prohibiting truthful advertisements for the sale of illegal narcotics, or prohibiting truthful but sex-discriminatory job advertisements). Where a drug company knowingly proposes the commercial use of its drugs, to be financed by the submission of false claims to the government, and where the company succeeds in

causing providers to use the company's drugs and submit materially false claims, the

First Amendment does not limit the drug company's FCA liability.  The illegality of a

portion of the proposed commercial conduct (the submission of false claims)

precludes First Amendment protection for the company's commercial speech.  That is

true regardless of whether the drug company expressly proposes that providers

submit false claims to the government, or whether context reveals that the submission

of false claims is part of the proposed course of commercial dealing.  A drug company

has no First Amendment right to knowingly cause providers to prescribe or

administer the company's drugs in non-reimbursable ways and submit false claims in

order to finance the use of the drug.

## III.  Medicare's Bundled Payment Systems Do Not Invite Fraud On The Government.

Finally, the defendants argue that even if they may have knowingly caused the

submission of false claims to the government, those claims were not material to the

government's decision to pay.  Defendants' Br. 49-54.

**A.**  False claims must be "material" to the government's decision to pay in

order to provide a basis for liability under the FCA.  The FCA defines a matter as

being material if it "ha[s] a natural tendency to influence, or [is] capable of influencing,

the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  The Supreme

Court offered guidance for implementing this requirement in *Escobar*, 136 S. Ct. 1989.

The Court began with the statutory definition and explained that materiality in the

FCA is the same as in other statutes and in common-law antecedents: the materiality inquiry focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002 (quoting 26 R. Lord, *Williston on Contracts* § 69:12, at 549 (4th ed. 2003)). A matter is material if: (1) a reasonable person would attach importance to it in determining the government's choice of action, or (2) the defendant knew or had reason to know that the government attaches importance to the specific matter in determining its choice of action, regardless of whether a reasonable person would do so. *Id.* at 2002-03 (citing Restatement (Second) of Torts § 538; Restatement (Second) of Contracts § 162(2) & cmt. c (1981)).

The Court made clear that determining materiality under this standard involves holistic consideration of a variety of factors, including "the Government's decision to expressly identify a provision as a condition of payment," *Escobar*, 136 S. Ct. at 2003; whether the violation is significant or "minor or insubstantial," *id.*; whether the violation goes to the "essence of the bargain," *id.* at 2003 n.5 (quoting *Junius Constr. Co. v. Cohen*, 178 N.E.2d 672, 674 (1931)); and what actions the government took in this or other cases where the government had "actual knowledge" of similar violations, *id.* at 2003-04.

**B.** Compliance with the requirements at issue in this case—the Anti-Kickback Statute and the drug coverage requirements—is material to the government's decision to pay. The AKS protects the government's interest in ensuring that the medical items and services given to beneficiaries result from a professional's sound medical

judgment, not illegal kickbacks. The strength of that interest, alone, indicates that a reasonable person would understand the importance of AKS compliance to the government's decision whether to pay a reimbursement claim under the public health insurance programs. And people familiar with the public health insurance programs have every reason to know about the importance the government attaches to AKS compliance. The text of the AKS makes noncompliance a felony, provides for $50,000 in civil penalties per violation, plus treble damages, and expressly states that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the FCA. 42 U.S.C. §§ 1320a-7a(a)(7), 1320a-7b(b), (g). And the government requires providers to declare in provider agreements that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with . . . [the AKS]." ER 568; *see also Hutcheson*, 647 F.3d at 392-94. The government has routinely pursued civil and criminal cases for AKS violations and FCA violations arising out of such activity.

Similarly, the drug coverage requirements governing the public health insurance programs, *see supra* note 2, protect the government's interest in ensuring that treatment provided to beneficiaries is reasonable, necessary, safe, and effective. The strength of that interest, alone, indicates that a reasonable person would conclude that compliance with the coverage requirements is material to the government. And the coverage requirements also confirm the importance the government places on them.

For example, the Medicare statute provides that "no payment may be made" for items, such as drugs, provided to beneficiaries under Medicare where they are not medically "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A).

If the government had actual knowledge about violations of these requirements in connection with care rendered to a beneficiary, whether the government was informed before submission of the claim or after the fact, the government "would attach importance" to those violations "in determining [its] choice of action" regarding whether to reimburse the provider. *Escobar*, 136 S. Ct. at 2002-03. As the district court correctly held, materiality may be established based on these considerations, at least in the context of a motion to dismiss. Any further factual analysis presents "issues not proper for determination as a matter of law." SER 9; *see also Hutcheson*, 647 F.3d at 395.

**C.** The defendants further contend that, whatever importance the government attaches to compliance with the AKS and the drug coverage requirements, the government is powerless to recover for Medicare fraud based on non-compliance with those requirements for one reason: the details of a payment mechanism. The defendants are mistaken.

The government reimburses hospitals for items and services provided to Medicare beneficiaries during inpatient stays and outpatient encounters via flat, bundled payments. *See* 42 U.S.C. §§ 1395*l*(t), 1395ww(d). When Congress created the bundled payment systems, it stopped paying for each item or service separately, on a

cost basis, and began paying for items and services in aggregated payments whose amount is based on the average cost of caring for similar patients in similar circumstances—thus creating incentives for providers to economize on the cost of care. *See Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d 1050, 1051 & n.1 (D.C. Cir. 1997). The amount of the bundled payment is based on what specific category the inpatient stay or outpatient encounter falls into. Categorization depends on the characteristics of the patient, his or her conditions, and some (but not necessarily all) of the treatment given to the patient. *See* 42 C.F.R. §§ 412.60, 419.31. Generally, each inpatient stay or outpatient encounter that falls into a given category is reimbursed by Medicare at the same flat rate—even if care provided to a particular patient happens to involve more or less (or more or less costly) treatment than is typical.[6] *Id.* §§ 412.1, 419.2.

The defendants seem to argue that Medicare's bundled payment systems permit providers to violate material requirements of the public health insurance programs, like the AKS and the drug coverage requirements, and still receive the full amount of

---

[6] Even within the bundled payment systems, the actual care provided may be relevant to the size of payment: First, drug use or non-use may contribute to categorization in certain cases. Second, where providers' actual costs exceed a certain threshold, Medicare pays for some of the excess through outlier payments. *See* 42 U.S.C. §§ 1395*l*(t)(5), 1395ww(d)(5)(A). Third, certain new drugs in the first several years of their use may be paid for via add-on or pass-through payments that compensate providers based in part on the actual cost of the drug. *See id.* §§ 1395*l*(t)(6), 1395ww(d)(5)(K). And fourth, in the inpatient stay context, "critical access hospitals" in rural areas are reimbursed partly based on the actual cost of the items and services actually provided to beneficiaries. *See id.* § 1395m(g)(1).

a bundled payment—at least where the violation involves an item or service that does not contribute to the categorization that determines the value of the bundled payment. Defendants' Br. 49-54. In so arguing, the defendants mistake the details of a payment mechanism for a decision by Congress to repeal, *sub silentio*, the fundamental requirements of the Medicare program.

Among the most important tools Medicare has to regulate the services provided to beneficiaries are the program's coverage requirements, which specify which medical items or services the government will reimburse a medical provider for administering to a beneficiary. For example, Medicare will pay for only those medical items or services that are "reasonable and necessary" for the diagnosis or treatment of a beneficiary. 42 U.S.C. § 1395y(a)(1)(A); *see also supra* note 2 (discussing other coverage limitations for drug uses). And Medicare will not pay for care arising from an illegal kickback under the AKS. ER 568 (provider agreement).

When Congress created the bundled payment systems, it left intact these material requirements that apply to the medical items and services actually administered to beneficiaries and that, thereby, protect the government's core interests in administering public health insurance programs. Those requirements still apply to the items and services provided to a Medicare beneficiary during an inpatient stay or outpatient encounter. And the government retains full legal authority to enforce those requirements, regardless of the details of how the government organizes payment to providers. As the D.C. Circuit has explained, in a related context,

Medicare bundled payments are made "in full satisfaction of the bundle of covered items and services provided during a single inpatient hospital stay." *Appalachian Regional*, 131 F.3d at 1053. A bundled payment "is certainly in some sense payment for each of the individual items or services that compose the bundle." *Id.*; *see also* 42 C.F.R. § 412.2(b)(1). Accordingly, the government may enforce any material requirement that is applicable to the individual items or services provided to a beneficiary, even if that care is reimbursed through the bundled payment system.

Indeed, the defendants' brief, at points, seems to agree. Defendants' Br. 52. The defendants apparently do not contest that the "reasonable and necessary" requirement applies, even in the bundled payment context, and argue that the relator has not adequately alleged a violation of that requirement—an issue on which the United States takes no position. *Id.* The defendants do not explain why the "reasonable and necessary" requirement would apply but other material requirements applicable to individual items or services would not. Just as Congress left the "reasonable and necessary" requirement intact when it enacted the bundled payment systems, Congress also kept the other material requirements applicable to items and services.

In sum, where covered care is provided to a beneficiary in compliance with material program requirements applicable to that care, a bundled payment will be made in compensation for that care—regardless of whether the provider also chooses to give the beneficiary uncovered and non-reimbursed care *outside* of that bundle (such

as cosmetic or experimental care, or care for a condition not eligible for inpatient care).  But where the care *inside* the bundle violates material requirements applicable to that care—such as the "reasonable and necessary" clause, the other drug coverage requirements, or the AKS—the government may deny payment for that care.

Despite the defendants' apparent agreement that at least one material requirement continues to apply to care provided inside a bundle, the defendants nonetheless seem to suggest, inconsistently, that Congress, in creating the bundled payment systems, intended to allow providers to be paid for care rendered inside that bundle without regard to compliance with material program requirements, such as the requirements at issue in this case.  Defendants' Br. 49-54.  The defendants thus appear to believe that providers could render medically unreasonable and harmful care inside the bundle that is the subject of government reimbursement (or provide care arising from a kickback) and still be legally entitled to receive a full bundled payment, so long as the non-compliant care was not relevant to categorization for the bundled payment. The defendants cite no statute or regulation supporting that counter-intuitive argument.

The defendants do cite four non-precedential district court cases wrongly concluding that bundled payments invite fraud on the government with respect to the care provided inside of the bundle.  *Id.*  The First Circuit has correctly held otherwise. *See Hutcheson*, 647 F.3d at 394-95 ("[The defendant's] argument that Medicare would excuse these violations [of material requirements regarding items or services] because

26

of a bureaucratic [bundled payment] mechanism . . . impermissibly cabins what the government may consider material.").  The details of Medicare payment mechanisms do not affect whether a violation of a program requirement is material to the government.

## CONCLUSION

For the foregoing reasons, this Court should hold that drug companies may be liable under the False Claims Act for knowingly causing medical providers to submit false claims to the government.

<div style="margin-left:40%">

Respectfully submitted,

BENJAMIN C. MIZER
*Principal Deputy Assistant Attorney General*

PHILLIP A. TALBERT
*Acting United States Attorney*

MICHAEL S. RAAB
DANIEL TENNY

 /s/ Joseph F. Busa
JOSEPH F. BUSA
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, D.C. 20530*
*(202) 353-0261*
*Joseph.F.Busa@usdoj.gov*

</div>

November 2016

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, amicus states that it knows of no related case pending in this Court.

/s/ Joseph F. Busa
JOSEPH F. BUSA

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a). This brief contains 6,954 words.

/s/ *Joseph F. Busa*
JOSEPH F. BUSA

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2016, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

_/s/ Joseph F. Busa_
JOSEPH F. BUSA